IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DONZI N.V., § | |
|     *Plaintiff* § | |
| § | |
| v. § | |
| § | |
| GLOBAL FINANCIAL SERVICES, L.L.C., § | CASE NO. 4:11-CV-03642 |
|     *Defendant* § | JURY TRIAL DEMANDED |
| § | |
| v. § | |
| § | |
| INTERACCIONES BANKING § | |
| CORPORATION LTD., and § | |
| ALEJANDRO LARA ANZOLA § | |
| *Third-Party Defendants.* § | |

### ALEJANDRO LARA ANZOLA'S MOTION TO TRANSFER
### WITH MEMORANDUM OF LAW

This international commercial dispute arises from former Venezuelan ruler Hugo Chavez' failed economic policies. Blaming speculators for the country's woes, Chavez imprisoned bankers and shut down markets. Defendant Alejandro Lara Anzola ("Lara"), the president of a brokerage house, fled Venezuela and settled near Miami, where he was granted political asylum. Plaintiff was an investor in an Antiguan bank owed by Lara and operated from Venezuela. It failed, and a receiver was appointed, because of Chavez' socialist policies. Plaintiff has settled its claims against the receiver and other parties and now pursues Lara individually. Pursuant to 28 U.S.C. § 1404, Lara respectfully moves to transfer this proceeding to the Southern District of Florida, the place of his exile.

# Background Facts

**I.     Lara forms a Venezuelan broker-dealer, Interacciones Casa de Bolsa C.A., and an Antiguan bank, Interacciones Banking Corp. Ltd., in the late 80s and early 90s.**

1.     Lara lived in Caracas, Venezuela from his birth in 1949 until 1963. He studied in the United States from 1963 to 1974, when he graduated from Syracuse University with an MBA. He moved back to Venezuela to begin his professional career and remained there until January 2011, when he moved to Florida as a result of the events described below.[1]

2.     In 1989, he formed Interacciones Casa de Bolsa C.A.("<u>Casa de Bolsa</u>"),[2] a Venezuelan entity similar to a U.S. broker-dealer. He formed Interacciones Banking Corp. Ltd. ("<u>IBC</u>"), an Antiguan bank, in 1994 but it did not begin operations until 1997. He was president and the sole beneficial owner of both Casa de Bolsa and IBC until they ceased operating. Of the two, Casa de Bolsa was considerably larger. It was a full service broker and traded securities in the Caracas Stock Exchange and other international markets. It offered peripheral products tied to the securities markets, such as lending on margin operations and futures and options trading, along with consulting services on economic and financial matters to multinational corporations seeking to do business in Venezuela. Prior to May 2010, Casa de Bolsa had 65 full time employees and 17,000 clients. IBC had six employees, five of whom worked in Caracas and a manager in Antigua, and only a handful of clients. Casa de Bolsa oversaw IBC's day-to-day

---

[1]     Except as otherwise noted, all facts are verified in Exh. 1, the Declaration of Alejandro Lara Anzola, which is incorporated by reference as if set forth herein.

[2]     *Interacciones casa de bolsa* translates as *Interactions brokerage house.*

operations pursuant to a management contract.

## II. Donzi invests $5.1 million with Lara's Antiguan bank knowing of its ties to Venezuela.

3.      Plaintiff Donzi N.V. ("Donzi") is a limited liability company organized and located in the island of Curacao, Dutch West Indies.[3] In 2009, Donzi invested $5.1 million in bonds and equities with IBC.[4]  Yvonne Schaap, Donzi's Managing Director, testified that "I always understood that Lara and the other IBC personnel with whom I dealt were located in Venezuela, at the location of the parent company of IBC."[5]

## III. Hugo Chavez and his finance minister, Jorge Gioradani, destroy Venezuela's economy and jail bankers, forcing Lara to flee to Miami.

4.      In the 2000s, Venezuelan president Hugo Chavez nationalized most of Venezuela's publicly traded companies, including its electrical company, Electricidad de Caracas, and telecommunications company, CANTV.  These two companies accounted for approximately 70% of market capitalization on the Caracas Stock Exchange.  This forced Venezuelan investment bankers to find new revenue streams to replace the commissions earned on the declining volume of stock trades.

5.      In 2003, in response to a crippling strike by the management and workers of the state oil company, Hugo Chavez imposed exchange controls to regulate the purchase and sale of foreign currencies within Venezuela.  Exchange controls are the exception rather than the norm because they can inflate demand for foreign currencies when the domestic currency is weak, creating a black market for stronger foreign

---

[3]    *See* Doc. 49 (Donzi's First Amended Complaint) at 1 ¶ 1.

[4]    *See* Doc. 49-2 at 3 ¶ 4 (Affidavit of Yvonne Schaap).

[5]    Doc. 49-2 at 3 ¶ 3.

currencies. The Venezuelan exchange control board, CADIVI,[6] never supplied all the hard currency that its economy required, however, so a parallel foreign exchange market known as the *permuta* sprang up.[7] On the *permuta*, government bonds and other securities could be bought in dollars and sold in bolivars, or vice versa, through brokerage houses such as Casa de Bolsa. The relation between dollars and bolivars on the *permuta* became the unofficial, free-market exchange rate.

6. Another important aspect of the Venezuelan financial services industry was the *mutuo*, which dated back to Venezuela's Capital Market Law of September 2, 1998.[8] The *mutuo* is a financial instrument through which a person who acts as lender of a security transfer the security to another person who acts as the borrower pursuant to a written contract signed by both. At maturity, the borrower must return the security along with a *premio*,[9] essentially a fee for use of the security calculated either as interest or as a fixed amount.

7. Casa de Bolsa relied heavily upon the *permuta* and *mutuo*, as did the Venezuelan financial services industry generally.

8. In late 2008, Venezuela's economy slumped as the price of oil plummeted. The price of oil recovered quickly, but Venezuela's economy did not.

9. In the middle of 2009, Chavez appointed a new Finance Minister, Jorge

---

[6]   *CADIVI* stands for *Comision de Administracion de Divisas*, or Commisison for the Administration of Foreign Currency

[7]   *Permuta* translates as *swap* or *barter*.

[8]   *Mutuo* translates as *mutual*.

[9]   *Premio* translates as *prize*.

Giordani. An electrical engineer by training, born in the Dominican Republic of leftist Spanish parents displaced by the Spanish Civil War, Giordani was a radical Marxist who intensely believed in the typically communist centralized government policies. The Finance Ministry oversees the regulation of financial markets, banks, insurance companies, and brokerage houses. Giordani and his cronies were very suspicious of the Venezuelan financial services industry, as it was complex and difficult to regulate.

10. On January 29, 2010, Chavez and Giordani repealed the regulations permitting the *mutuo* and gave brokerage firms until April 30th to liquidate every *mutuo*-related transaction. This forced brokerage firms, including Casa de Bolsa, to liquidate their *mutuo* portfolios, which were designed to be held long term, at fire sale prices under distressed conditions. They were still required to honor the full amount of their *mutuo* liabilities, however. This had a disastrous effect, not unlike what would happen in the U.S. if every bank were forced to pay all of its account holders for their deposits in cash.

11. Lara, who spent twenty years building Casa de Bolsa, was determined to keep it alive. He believed that income from trading on the *permuta* market would provide sufficient capital for Casa de Bolsa to weather the crisis. By the middle of February, he had assembled a team of financial consultants. By the middle of March, they had created a restructuring plan requiring capitalization of US $3.4 million and a medium term loan of US $4 million. At this point, *permuta* trading was at an all-time high as nervous Venezuelans began moving their money from bolivars into dollars, increasing the parallel dollar rate by a staggering 33% almost overnight. To fund the reorganization, Lara borrowed $3 million from his family and another $350,000 from a

private Venezuelan investor. Casa de Bolsa borrowed $4 million from IBC. Lara, along with the financial consultants and boards of directors of Casa de Bolsa and IBC, believed this to be in both Casa de Bolsa's and IBC's interest as IBC could not survive without Casa de Bolsa.

12. As a result of Lara's frenetic efforts to restructure, Casa de Bolsa survived the April 30th deadline. The crisis appeared to be over. Casa de Bolsa and IBC had survived intact, a little bruised perhaps but in good shape overall considering the circumstances. Unfortunately, the euphoria did not last. The Chavez regime was unhappy because inflation was still rising. Blaming bond traders for Venezuela's continued malaise, Chavez closed the *permuta* on May 20, 2010 with no advance warning. Casa de Bolsa lost 80% of its income and 95% of its cash flow overnight. Within days, Venezuelan officials had raided about one-third of the country's brokerage houses and imprisoned numerous brokers, many of whom languished in jail for over two years while their companies were liquidated. All of Casa de Bolsa's clients panicked, understandably so in light of Chavez' threats, and demanded their money back. There was nothing left to do but liquidate Casa de Bolsa.

11. At the end of September, Lara received word that Casa de Bolsa would be raided and its remaining assets and property confiscated. Vladimir Falcon, a director for both Casa de Bolsa and IBC and Casa de Bolsa's outside counsel, resigned. Susana Vallanueva, a director and founding member of both Casa de Bolsa and IBC and a vice president of IBC, resigned and moved to Spain, along with Guillermina Villafruela, Casa de Bolsa's comptroller and vice president of administration. Lara continued the process

of liquidating Casa de Bolsa until January 20, 2011, when the Venezuelan government formally decreed the intervention and seizure of Casa de Bolsa. Three days later, Lara moved to Weston, a suburb of Miami, with his wife and child.

12. Lara still resides in Weston with his family. Their application for political asylum was granted in February 2012. They survive on money they were able to bring out of Venezuela. They have enough to survive for about another year before they have to make some tough choices, such as whether to pay lawyers or defend this lawsuit *pro se* and put that money toward food and rent. He is working to establish some new business ventures but, to date, none have been successful, partly because he was diagnosed with post-traumatic stress disorder but also because it is just plain hard for a 65-year old man to start over in a country that does not speak his native tongue.[10]

13. Chavez' and Giordani's "reforms" were disastrous for the Venezuelan economy. According to the 2013 Global Misery Index Scores, Venezuela is ranked as the top spot globally with the highest misery index score. The Heritage Foundation ranks Venezuela 175th out of 178 countries in economic freedom. On March 9, 2015, noting the Venezuelan government's persistent human rights violations, President Barack

---

[10] Lara understands that Milton Harms, a Donzi principal believed to be the chief driving force behind its decision to continue to pursue him, believes that he is wealthy and spends his days sailing on a yacht. It is true that Lara did possess a yacht while in Florida. The yacht, *Maria Bonita IV*, was owned by Almenar Overseas Inc., a Panamanian corporation and the note was guaranteed by Casa de Bolsa. It was purchased in 2006 and brought to Venezuela in 2007. As part of Casa de Bolsa's restructuring, Lara agreed to sell the yacht to reduce its operating expenses. Lara sent the yacht to the U.S. in May 2010. Lara sold the yacht on June 10, 2011, at a time when the market was distressed, for $1.25 million. *See* Exh. 2. After paying the secured creditor, broker's commission, and other closing costs, the sale netted $5,114.97. Lara transmitted these funds to IBC to repay its guaranty.

Obama declared a national emergency to address the threat to U.S. national security and foreign policy.[11]

### Nature and Stage of Proceeding

14.    On February 24, 2011, Donzi filed suit against Global Financial Services LLC ("Global") in the 113th district court of Harris County against under cause no. 2011-11903 after it was unable to withdraw securities held in IBC accounts there.  Global filed a third-party action against Lara and IBC in state court.[12]

15.    On June 6, 2011, the Financial Services Regulatory Commission, the Antiguan body that regulates banks, appointed receivers for IBC.  Those receivers removed the case to this court.[13]  Donzi added Pinnacle Summer Investments, Inc. f/k/a Edelman Financial Group, Inc. ("Pinnacle") and Alfredo Tellez, a Global employee ("Tellez"), as defendants, and asserts claims directly against Lara and IBC.[14]

16.    In October 2011, the Antiguan regulators filed a petition to wind up IBC and appoint the receivers to liquidate its assets which was granted on March 16, 2012.[15]  IBC filed a chapter 15 petition in the Bankruptcy Court for the Southern District of Texas, Houston Division under case no. 12-33561.  On August 28, 2012, this Court

---

[11]    *See* Exh. 3 (March 9, 2015 executive order), available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/venezuela_eo.pdf.  Lara requests that this court take judicial notice of this executive order pursuant to Fed. R. Evid. 201(b)(2).

[12]    *See* Doc. 2-6 at 5 – 6 ¶¶ 27 – 28.

[13]    *See* Doc. 1.

[14]    *See* Doc. 49 (Donzi's First Amended Complaint).

[15]    *See* Doc. 80 at 2 ¶¶ 5.

granted Lara's stay motion.[16]  At that time, Donzi asserted claims against Global, Pinnacle, Tellez, IBC, and Lara.[17]  Global asserted claims against Donzi, IBC, and Lara.[18] Lara asserted a claim for indemnity against Donzi.[19]

17. All parties except Lara settled their claims against each other.[20]  The settlement provided that (i) Global would liquidate all IBC assets and remit the proceeds to the IBC receivers, who would in turn deduct their defense costs for this proceeding and pay the remainder to Donzi; (ii) Global would pay $20,000 to Donzi; and (iii) Global would pay $20,000 to IBC.[21]  The settlement agreement preserved Donzi's and Global's claims against Lara.[22]

18. This court lifted the stay on January 13, 2015.[23]

## Statement of Issue & Standard of Review

19. The issue before whether court is whether venue should be transferred to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a).  The party challenging venue under 28 U.S.C. § 1404(a) bears the burden of demonstrating that the court should, in its sound discretion, transfer the action.[24]  The court's ruling is subject to review on

---

[16]     *See* Doc. 73

[17]     *See* Doc. 49.

[18]     *See* Doc. 53.

[19]     *See* Doc. 68.

[20]     *See* Doc. 80-2 at 15 § 5.

[21]     *See* Doc. 80-2 at 15 § 3.

[22]     *See* Doc. 80-2 at 15 § 5.

[23]     *See* Doc. 87.

[24]     *See, e.g., Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989).

appeal for abuse of discretion and on mandamus for clear abuse of discretion.[25]

## Argument & Authorities

20. This case pits a wealthy Caribbean investor, Donzi, and an international investment firm, Global, against a Venezuelan refugee. When Donzi first filed suit, Houston was a proper venue as Global was the only defendant and it headquarters here. Indeed, Houston was the only proper venue. Things have changed. Donzi and Global settled their claims against each other and IBC and now target Lara. Notwithstanding that the parties are not yet formally realigned, Donzi and Global are plaintiffs and Lara is the sole defendant.

### I. 28 U.S.C. § 1404(a) and the public and private interest factors

21. This court is empowered to transfer this case to any other district or division where it might have been brought for the convenience of parties and witnesses, and in the interest of justice.[26] Public and private factors guide this determination.[27] The private interest factors include (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of willing witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive.[28] The public interest factors are (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the familiarity of the forum with the law that

---

[25] *See In re Volkswagen of Am., Inc.*, 545 F.3d 304, 308 – 11 (5th Cir. 2008) (en banc).

[26] *See* 28 U.S.C. § 1404(a).

[27] *See, e.g., In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc).

[28] *See id.*

will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or the application of foreign law.[29] These factors are not exhaustive or exclusive and none has dispositive weight.[30]

## II. Donzi's and Global's claims could be brought in the Southern District of Florida because Lara resides there.

21. Thus, the first question whether Donzi's and Global's claims against Lara could be brought in the Southern District of Florida, where he resides. The answer is yes. Venue is proper where the defendant resides.[31] Thus, in determining whether to transfer, the court should consider the public and private interest factors.

## III. The public interest factors favor transfer as Diana Espino, a third-party witness, resides in the Southern District of Florida.

22. The first private interest factor is the relative ease of access to sources of proof. IBC's bank records are located in Antigua and Casa de Bolsa's records are in Venezuela. Global's records are in Houston, and the few documents that Lara was able to bring with him from Venezuela are in Weston. Counsel anticipates that these documents will be produced in discovery. Donzi is subpoenaing records from JP Morgan Chase in New York.[32] This factor is neutral.

23. The second private interest factor is the availability of compulsory process to secure the attendance of witnesses.[33] Lara's witnesses consist of the following, in

---

[29] *See id.*

[30] *See id.*

[31] *See* 28 U.S.C. § 1391(b)(1).

[32] *See* Exh. 4 (JPMCC subpoena duces tecum).

[33] *See In re Volkswagen*, 545 F.3d at 315.

alphabetical order:

- Alejandro Lara Anzola – defendant (Weston, Florida);
- Maria Gabriela Coa – former IBC employee (Venezuela);
- Nelson Corrie – former head trader at IBC (Venezuela);
- Diana Espino – former IBC consultant (Weston, Florida);
- Vladimir Falcon – IBC director and outside counsel (Venezuela);
- Igor Penuela – assisted in liquidation of IBC (Venezuela);
- Alfredo Tellez – senior VP of Global (Houston);
- Susana Villanueva – former director of IBC (Spain); and
- Guillermina Villafruela – former comptroller of IBC (Spain).

Of these nine witnesses, Lara is a party and Alfredo Tellez is an employee of a party (Global). Of the seven remaining, four reside in Venezuela and two in Spain, so the relative ease of access to sources of proof is the same regardless of whether this case proceeds in Houston or Miami. Diana Espino, the only non-party witness in the U.S., also resides in Weston, Florida. Obviously, federal subpoenas can be issued and enforced nationwide, so the parties can obtain deposition testimony from her regardless of whether this case proceeds in Houston or Miami, but Lara cannot subpoena her to appear for trial in Houston. This factor weighs in favor of transfer.

23.    The third private interest factor is the cost of attendance for willing witnesses. This factor favors transfer. Donzi is located in the Caribbean, so it will incur travel costs to appear regardless of whether trial is in Houston or Miami. Global will

incur travel costs if this case is moved to Miami, so in that sense a transfer merely shifts travel costs from Lara to Global. Lara respectfully submits that Global, a "leading wealth management firm based in Houston, Texas that specializes in meeting the domestic and international needs of high-net worth individuals, families and corporation,"[34] and who is now a party to this lawsuit by choice, can better bear travel costs than Lara, a Venezuelan expatriate slowly depleting the money he was able to get out of Venezuela. Diana Espino, the only witness in the U.S. who can corroborate Lara's account, also resides in Weston, Florida and thus could testify at trial in the Southern District of Florida without incurring travel costs.

24.  The fourth private interest factor is a catch-all for other logistical issues that make trial easy, expeditious, and convenient. Lara does not dispute that transferring this case to the Southern District of Florida will shift the inconvenience to Global, who is headquartered in Houston. Again, though, Global is a party by choice. Donzi, headquartered in the Dutch West Indies, will be inconvenienced either way. But transferring the case to the Southern District of Florida will greatly ease the burden of trial on Lara, an individual without the resources to go head-to-head against well-funded plaintiffs. This factor favors transfer.

**IV.    The public interest factors favor transfer as the Southern District of Florida is home to a sizeable number of Venezuelan refugees, like Lara, who have an interest in resolving this dispute.**

25.  The public interest factors also favor transfer. The first public interest factor is the administrative difficulties flowing from court congestion. This factor is

---

[34] Lara requests judicial notice of this statement on Global's website at www.globalhou.com.

neutral, as Lara does not allege that the Southern District of Florida can devote more resources, or try this case faster, than this court.

26. The second public interest factor – the local interest in having localized controversies decided at home – weighs in favor of transfer. It is true that this dispute is international, involving one company from the Dutch West Indies, Donzi; an Antiguan bank, IBC; a Houston investment firm, Global; and a Venezuelan expatriate, Lara. In that sense, this is not a localized controversy. In other sense, however, this dispute belongs in the Southern District of Florida. Miami and Weston are home to a sizeable number of Venezuelan expatriates familiar with Chavez and his methods.[35] This factor weighs in favor of transfer.

27. The third and fourth public interest factors involve conflict of laws. The contract between IBC and Donzi is governed by Antiguan law.[36] Given Miami's proximity to Antigua, the Southern District of Florida may have more expertise in applying Antiguan law, but admittedly this is speculative. This factor is either neutral or weighs slightly in favor of transfer.

V. **The interests of justice favor transfer as Donzi and Global, two well-financed international companies, can better bear the burden of travel than Lara, a Venezuelan expatriate.**

28. Lara submits that the interests of justice compel transferring this case to the Southern District of Florida. Neither Donzi nor Global alleges that Lara pilfered Donzi's securities or personally profited from them, and to the extent that anyone believes that,

---

[35] *See* Exh. 1 (Lara Decl.) at ¶ 21.

[36] *See* Doc. 68-1 at 5 § 18.

Lara unequivocally testifies that did not happen.[37] Donzi's securities never left Global's account, at least not according to Lara's direction,[38] notwithstanding allegations that Lara improperly used them as collateral for a loan to IBC. Donzi invested with IBC will full knowledge that it was operated out Venezuela and subject to the vicissitudes of the Chavez regime. Shifting the inconvenience from Lara to Global, whose very name suggests a worldwide presence, and Donzi is appropriate given their economic disparity. Transferring this case to the Southern District of Florida will minimally inconvenience Global and Donzi but greatly ease the burden on Lara of trying this case.

29. Sometimes bad people do bad things. Other times, good people get caught up in a maelstrom through no fault of their own. Lara is not a thief living lavishly with Donzi's money. He is but one victim of a socialist leader's misguided economic policies which have impoverished not only him but a nation of 29 million people. Donzi and Global are entitled to try their case. Lara seeks only to transfer this case to the Southern District of Florida to present his side of the story as best he can to a jury of his peers.

---

[37] *See* Exh. 1 at ¶ 23.

[38] The settlement agreement does reference that some of Donzi's securities are no longer with Global. *See* Doc. 80-2 at 15 § 3. Lara did not instruct Global to dispose of these assets.

## Conclusion

Lara prays that this Court transfer this case to the Southern District of Florida to be tried in its county of origin pursuant to local rule 3.1.

                Respectfully submitted,

                /s/  Maurice Bresenhan, Jr.
                MAURICE BRESENHAN, JR.
                Texas Bar No. 02959000
                1177 West Loop South, Suite 1100
                Houston, Texas 77027
                713-965-9969
                713-963-9169 – Facsimile

                ***ATTORNEY IN CHARGE FOR DEFENDANT ALEJANDRO LARA ANZOLA***

**OF COUNSEL:**

**ZUKOWSKI, BRESENHAN & SINEX, L.L.P.**
KEVIN PENNELL
Texas Bar No. 24046607
PASCAL PAUL PIAZZA
Texas Bar No. 15966850
1177 West Loop South, Suite 1100
Houston, Texas 77027
(713) 965-9969
(713) 963-9169 [Telecopier]

## Certificate of Conference

I have conferred with counsel for plaintiff Donzi N.V. and defendant Global Financial Services LLC and they oppose the relief sought by this motion.

                /s/ Kevin Pennell

## **CERTIFICATE OF SERVICE**

      I hereby certify service of a true and correct copy of Alejandro Lara Anzola's Agreed Motion for Extension on the 16th day of March 2015 via CM/ECF and facsimile, as follows:

| | |
|---|---|
| Mary Olga-Lovett, Jennifer Tomsen, Pamela Ferguson<br>Greenberg Traurig LLP<br>1000 Louisiana Ste 1700<br>Houston, TX 77002 | *Via fax (713) 374-3505* |
| Daniel Blanchard, James Ponsetto, John Farraher, Jr.<br>Greenberg Traurig LLP<br>One International Place<br>Boston, MA 02110 | *Via fax (617)310-6001* |
| Paul E. Pelletier<br>Mintz Levin<br>701 Pennsylvania Ave NW<br>Washington, DC 20004 | *Via fax (202)434-7400* |
| Andrew Harvin<br>Doyle Restrepo et al<br>440 Louisiana Ste 2300<br>Houston, TX 77002 | *Via fax (713)228-6138* |
| Alison Leigh Smith<br>McDermott Will Emery<br>1000 Louisiana Ste 3900<br>Houston, TX 77002 | *Via fax (713)739-7592* |

A courtesy copy is also being delivered to the Court's chambers.

                                                                /s/ Maurice Bresenhan, Jr.